UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                              | )                               |
|----------------------------------------------|---------------------------------|
| BRUNO GIARDIELLO, et al.,                    | )                               |
|                                              | )                               |
| Plaintiffs,                                  | )                               |
|                                              | )                               |
| v.                                           | ) Civil Action No. 16-12637-JCB |
|                                              | )                               |
| MARCUS, ERRICO, EMMER                        | )                               |
| & BROOKS, P.C., et al.,                      | )                               |
|                                              | )                               |
| Defendants.                                  | )                               |
|                                              | )                               |

ORDER ON DEFENDANTS' MOTION TO DISMISS
[Docket Nos. 5, 7]

August 18, 2017

Boal, M.J.

In this action, Plaintiffs Bruno Giardiello ("Bruno Sr.") and Bruno Schneider ("Bruno Jr.") allege, among other things, that the defendants violated the Fair Housing Act ("FHA") and state law by failing to accommodate their request to keep a service dog in their condominium unit. Defendants have moved to dismiss the complaint. Docket Nos. 5, 7. The Court heard oral argument on August 17, 2017. For the following reasons, the Court[1] denies the Board and the Trust's motion to dismiss and grants Attorney Gaines and the Law Firm's motion to dismiss.

I.  FACTUAL BACKGROUND

   A.  Scope Of The Record

In considering the merits of a motion to dismiss, the Court may look only to the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the

---
[1] On January 19, 2017, the parties consented to the jurisdiction of a magistrate judge for all purposes. Docket No. 10.

1

complaint and matters of which judicial notice can be taken.  Nollet v. Justices of the Trial Court of Mass., 83 F.Supp.2d 204, 208 (D. Mass. 2000), aff'd, 248 F.3d 1127 (1st Cir. 2000).  Courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties, for official public records, for documents central to plaintiffs' claim or for documents sufficiently referred to in the complaint.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).  Consideration of other materials is generally forbidden unless the motion is properly converted into one for summary judgment.  Id.

Here, the Defendants have attached or otherwise referred to documents and materials not attached to the complaint.  First, the Defendants have attached to their motion copies of letters of correspondence from their attorney to the Plaintiffs.  Docket Nos. 6-1 through 6-6; Docket Nos. 8-1 through 8-6.  Because the Plaintiffs have referred to each of these documents in their complaint, see Complaint ¶¶ 51-52 (pages 10-11),[2] 53, 55, 61, 64, it is appropriate to consider them in connection with this motion.

The Defendants have also attached to their motion a copy of a January 18, 2017 amended complaint filed by them against the Plaintiffs to establish and enforce a lien for unpaid common expenses.  Docket Nos. 6-7, 8-7.  The Defendants proffer this document to attempt to disprove the Plaintiffs' allegation that the Condominium Board assessed fines and legal fees against Bruno Sr. for the period of time in which he kept the dog without the Board's permission.  Docket No. 6 at 11.  They explain that the Board filed a collection action in Middlesex District Court against Bruno Sr. to collect fines and legal fees but later amended its complaint to waive the fines, so that the Board is seeking only to recover late fees, costs and attorney's fees in

---

[2] The Complaint repeats paragraph numbers 46-52.  When citing to these paragraphs, the Court also cites to the page number where they appear.

connection with matters unrelated to the dog. Docket No. 6 at 6. They argue that the Court may consider the amended complaint in the Middlesex District Court action as a matter of which judicial notice can be taken. Id. at 11. Though the Court may take judicial notice of court records and judicial proceedings under some circumstances, such as to confirm the fact of filing, it may not do so in order to discern the truth of the facts asserted within that filing. See Lopes v. Riendeau, 177 F. Supp. 3d 634, 666-667 (D. Mass. 2016). Here, the amended complaint alone does not show that the Defendants in fact waived any fines and legal fees related to the dog. In order to discern that, the Court must consider the Defendant's explanations regarding the amended complaint, which is not appropriate on a motion to dismiss. Therefore, even if it was proper to consider the amended complaint for that purpose, it does not actually support the Defendants' assertions. Accordingly, the Court will not consider the amended complaint.

B. Facts[3]

Bruno Sr. is an individual residing at Waite Street, Unit #33, Malden, Massachusetts (the "Unit"), which is located in a thirty-three unit complex known as the Candlelight Park Condominiums ("Candlelight Park"). Complaint ¶ 1. He purchased the Unit in 2002, when he initially resided there with his son, Bruno Jr. Id.

Defendant Candlelight Park Condominium Trust (the "Trust") is the entity empowered with decision making authority for the management of Candlelight Park. Id. at ¶ 3. The Trust is governed by a Board of Trustees (the "Board"). Id. The Board is responsible for the establishment and enforcement of Candlelight Park's rules and regulations. Id.

---

[3] Because this case is presently before the Court on a motion to dismiss, the Court sets forth the facts taking as true all well-pleaded allegations in the complaint and drawing all reasonable inferences in Plaintiffs' favor. See Morales-Tañon v. P.R. Elec. Power Auth., 524 F.3d 15, 17 (1st Cir. 2008).

Defendant Joseph Wamness is a resident of Candlelight Park and the President of the Board. Id. at ¶ 4. Defendants Matthew Yu, Cathy DiMaggeo, Alan Hartin, and Igor Demagelhaes are residents of Candlelight Park and members of the Board. Id. at ¶¶ 5-8.

Defendant Matthew Gaines is a lawyer at defendant Marcus, Errico, Emmer & Brooks, P.C. (the "Law Firm"). Id. at ¶¶ 9-10. Gaines and the Law Firm represented the Trust and the Board in the underlying dispute. Id. at ¶ 10.

Bruno Jr. suffers from post-traumatic stress syndrome ("PTSD"). Id. at ¶ 29. This condition subjects him to debilitating panic attacks, which come on suddenly and manifest in spikes of his heart rate and blood pressure leaving him panicked and immobilized. Id. To alleviate the symptoms of his condition, his doctor prescribed an emotional support animal. Id. at ¶ 30.

On the advice of his doctor, Bruno adopted Kyla, a mixed-breed dog who was going to be euthanized. Id. Kyla instantly bonded with Bruno Jr. so that she recognizes the symptoms of his panic attacks. Id. Having been trained as a police dog, Kyla is able to calm Bruno Jr. and alleviate the debilitating effects of Bruno Jr.'s panic attacks. Id. Kyla is also trained not to bark. Id.

When Bruno Sr. first bought the Unit in 2002, Bruno Jr. resided there for about four years, id. at ¶ 32, until he moved to Florida. Id. at ¶ 2. In or around October 2015, Bruno Jr. informed Bruno Sr. that he could no longer reside in Florida. Id. at ¶ 34. Bruno Sr. invited Bruno Jr. to live with him. Id.

The master deed for Candlelight Park prohibits residents from having dogs in their units. Id. at ¶ 31. This prohibition frightened Bruno Jr. and made his fragile emotional state much more tenuous. Id. at ¶ 35. He needed a place to live immediately but the prospect of abandoning

4

Kyla was out of the question.  Id.  Consequently, he waited desperately in Florida to come to the Unit until his father could make the proper arrangements with the Board to accommodate Kyla.  Id.

The Board never established any formal procedures for a disabled person residing at Candlelight Park to make a reasonable accommodation request.  Id. at ¶ 18.  In or around October 2015,[4] Bruno Sr. approached Yu after a regularly scheduled condominium association meeting to inquire about the process for obtaining an accommodation so that Bruno Jr. could keep Kyla in the Unit.  Id. at ¶ 36.  Despite the "urgent request," Bruno Sr. received no reply from Yu or any of the other members of the Board.  Id. at ¶ 37.

Having received no reply, Bruno Sr. left several voice mail messages for Yu making repeated requests for an "interactive dialog," but received no replies.  Id. at ¶ 38.  Given their neighborly relationship over the years, Bruno Sr. found Yu's sudden and complete cessation of communication was highly out of character.  Id.

In or around December 2015, Bruno Sr. saw Wamnes and told him that Bruno Jr. would be coming to live with him in the Unit, and that he needed a reasonable accommodation to be able to keep a service dog.  Id. at ¶ 39.  He requested that Wamnes act urgently because his son would otherwise be homeless.  Id.  Wamnes did not respond to Bruno Sr.'s request, nor did any other Board member on his behalf.  Id. at ¶ 40.

The Plaintiffs allege that because they both had fine relationships with the members of the Board prior to their request to keep Kyla in the Unit, "it is logical to infer that Kyla's

---

[4] The date provided in the Complaint is not exact.  Rather, it states that this interaction occurred "about two weeks after [Bruno Sr.'s] mother died."  Complaint ¶ 36.  The Complaint alleges that Bruno Sr.'s mother died in "late October 2015."  Complaint ¶ 33.  Drawing all reasonable inferences in the Plaintiffs' favor, the Court assumes that the interaction occurred sometime in late October 2015.

5

presence at Candlelight Park is what instigated the Trustees' sudden 'about-face.'" Id. at ¶ 41. The Board did not want dogs in Candlelight Park, regardless of whether any such dog was a service dog. Id. at ¶ 42. The Plaintiffs also allege that the Trustees failed to engage in dialog with Bruno Sr. about the requested accommodation because if they had done so, Bruno Jr. would have been able to obtain the necessary documentation before moving in to the Unit and the Board would have been powerless to prevent Kyla from living there. Id. at ¶ 43.

The Board met to discuss Bruno Sr.'s requests for accommodation on one or more occasions between late November 2015 and early February 2016, without informing him of any such meetings. Id. at ¶ 45. At those meetings, the Board agreed to evade Bruno Sr.'s request for reasonable accommodation, and thereby create a confrontation where Bruno Jr. arrived at Candlelight Park with Kyla but without prior accommodation. Id. at ¶ 46 (page 11).

On January 15, 2016, Bruno Sr. sent an email to the Board members requesting a dialog about his request for accommodation. Id. at ¶ 47 (page 11). There was no response to the email. Id.

In or around the last week of January 2016,[5] with no other place for him to stay, Bruno Jr. moved to the Unit with Kyla. Id. at ¶ 48 (page 10). Shortly after their arrival, DiMaggeo and Wamnes encountered Bruno Jr. on the premises with Kyla. Id. at ¶ 49 (page 10). Bruno Jr. advised them that he had returned to live in the Unit with his father, that Kyla was his service dog, was a trained police dog, had her adoption papers, and never barks so she would not be a disturbance. Id.

On February 4, 2016, Wamnes sent an email to Bruno Sr. stating that:

---

[5] The Complaint states January 2015, but given the sequence of events, it appears that this is a typographical error.

6

> In view of the fact that our response to your original email was not more timely, we will grant you up to one week to remove the dog from the premises. If the dog is not removed by Friday, February 12, 2016, we will begin the process of an initial and daily fine . . .

Id. at ¶ 50 (page 12).

On February 9, 2016, Attorney Gaines sent an email to Bruno Sr. attaching a letter. Id. at ¶ 51 (page 10). The letter stated, among other things, that the Board would allow Bruno Jr. to keep the dog at the Unit if Bruno Jr. submitted documentation "demonstrating that he is handicapped within the meaning of the statute, whether the handicap substantially limits one or more major life activities, and the nexus between the requested accommodation and the handicap . . ." Id.; Docket No. 6-1 at 1; Docket No. 8-1 at 1. The letter enclosed a Certification Form to be completed by Bruno Jr.'s doctor and returned to the Board. Docket No. 6-1 at 3-5; Docket No. 8-1 at 3-5. The letter also stated that "**if a completed copy of this form is not returned to my attention within ten (10) days from the date of this letter, then the dog must be permanently removed from the premises, and if it is not, your account will be assessed fines.**" Docket No. 6-1 at 2; Docket No. 8-1 at 2 (emphasis in original).

The Plaintiffs allege that Bruno Jr. could not comply with a "vague request for information within an impossibly short deadline." Complaint at ¶ 52 (page 11). On February 23, 2016, Attorney Gaines sent Bruno Sr. another email with an attached letter. That letter stated in relevant part:

> When we spoke on the phone on February 10th, you stated that you would provide the requested information by February 19th. As of today, no information has been received. As such, we assume that the dog is not necessary due to a disability, and therefore, **the dog must be immediately removed from the premises.**

Docket No. 6-2 at 1; Docket No. 8-2 at 1 (emphasis in original). That letter also warned that pursuant to the rules and regulations of Candlelight Park, Bruno Sr.'s account had been assessed

7

an initial fine of $50.00 and that a fine of $10.00 per day would continue to accrue until the dog was removed. Id. In addition, the letter stated that the Board had the right to assess any and all legal fees and costs incurred, including the cost of sending the letter to him. Id.

"Under extreme duress at being forced to choose between homelessness or living with his service dog, Bruno Jr. moved out of the Unit into a friend's apartment for a short period." Complaint ¶ 51 (at page 12). Unable to procure a doctor's appointment during the busy flu season, Bruno Jr. obtained what appears to be an official document from a website called "Service Dog of America," with a picture of Kyla, identifying her as a legitimate service dog. Id. at ¶ 52 (page 12). However, the website was not legitimate. Id. Bruno immediately produced a copy of this document to Attorney Gaines. Id.

On March 23, 2016, Attorney Gaines sent Bruno Sr. another email with an attached letter. Id. at ¶ 53. In that letter, Attorney Gaines stated, among other things, that "[a]s no documentation has been provided, we assume that the dog is not necessary for a disability and must be removed." Id.; Docket No. 6-3 at 1; Docket No. 8-3 at 1. The letter also advised Bruno Sr. that the total amount of fines assessed to his account to date was $360.00 and that he would continue to accrue daily fines until the dog was removed from the Unit. Id. Finally, the letter stated that:

> **This letter shall constitute your final notice and demand to remove the dog.** If the dog is not removed by the closing of business on April 8, 2016, the Board will pursue a legal action against you to have the dog removed. The legal fees and costs for the lawsuit, if necessary, will be assessed to your account. The fines, together with the legal fees and costs, if unpaid, will constitute a lien on your Unit.

Docket No. 6-3 at 1; Docket No. 8-3 at 1 (emphasis in original).

After receiving the March 23 letter, Bruno Sr. immediately called Attorney Gaines and renewed his request for dialog with the Board. Complaint ¶ 54. Attorney Gaines responded to

Bruno's request for dialog by letter dated March 25, 2016.  Id. at ¶ 55.  In relevant part, Attorney Gaines stated that:

> With respect to your request to meet with the Board of Trustees regarding this matter, I relayed that request to the Board and they have respectively declined to meet with you at this time.  Simply put, there is not point to such a meeting as this issue is very clear, and there is nothing to discuss or negotiate.

Id.; see also Docket No. 6-4 at 1; Docket No. 8-4 at 1.  According to the Plaintiffs, the March 25 letter was the first time Attorney Gaines put them on notice that the information he was insisting on had to come from a "medical provider."  Complaint ¶ 56.

On April 19, 2016, Attorney Gaines sent an email to Bruno Sr. stating that because "the dog remains in the Unit . . . the Board has authorized our office to proceed with the drafting and filing of the lawsuit . . . this will cost about $2,500 - $4,000.  Again, these costs will be assessed to your account."  Id. at ¶ 57.

Two days later, Dr. Benbassett-Miller from Cambridge Health Alliance provided Bruno Jr. with a letter stating that:

> To Whom It May Concern:  The above named patient has a service dog to assist in his psychiatric treatment plan.  Please allow him to maintain his dog with him in his home.  Please feel free to call our office with any questions or concerns.

Id. at ¶ 58.  Dr. Benbassett-Miller assured Bruno Jr. that the format of this letter was the same one that was routinely given by the clinic to housing providers on behalf of disabled persons in need of reasonable accommodation.  Id. at ¶ 59.  The doctor further advised Bruno Jr. that, in her experience, no housing provider had ever deemed this form insufficient to satisfy a disabled person's request for reasonable accommodation.  Id.

Despite Dr. Benbassett-Miller's offer to address the Board's questions or concerns, Attorney Gaines adjudicated her letter insufficient.  Id. at ¶ 61.  By letter dated April 26, 2016,

Attorney Gaines insisted for the first time that only the Certification Form would suffice. Specifically, Attorney Gaines stated that Dr. Benbassett-Miller's letter was insufficient because it did not state that Bruno Jr. was disabled and needed the dog for a disability. Id.; Docket No. 6-5 at 1; Docket No. 8-5 at 1. Further, Attorney Gaines stated:

> The Board is willing to provide you with **one final opportunity** to provide the necessary paperwork. **Enclose please find a Certification Form that must be completed by Bruno's doctor and return to my attention.** I would note that I have previously provided you with this form and told you on multiple occasions that this form must be completed; however, for some inexplicable reason you have failed to do so. Notwithstanding that fact, the Board will give you one final opportunity to have this form completed before filing a lawsuit to have the dog removed. **Please be advised that if we do not receive a completed copy of the enclosed form by the end of the day on Wednesday, May 4, 2016, we will proceed with the filing of the lawsuit to remove the dog (which lawsuit has already been drafted).** As a reminder, your account continues to be assessed fines and legal fees related to this matter, and if a lawsuit is necessary, you will be assessed the legal fees and costs for such lawsuit.

Docket No. 6-5 at 1; Docket No. 8-5 at 1 (emphasis in original).

Bruno was able to procure an appointment with a different doctor on May 2, 2016. Complaint ¶ 62. That doctor remarked that the nature and scope of the Certification Form crossed the line of the HIPAA patient privacy laws and he did not have to answer. Id. When he insisted, the doctor would only proceed if Bruno Jr. answered each question under the rules of disclosure proscribed by HIPAA. Id.

Bruno Jr. provided the completed Certification Form immediately to Attorney Gaines and to the Trustees. Id. at ¶ 63. By letter dated May 17, 2016, Attorney Gaines advised Bruno Sr. that the Board had approved Bruno Jr.'s request for an accommodation. Id. at ¶ 64. Attorney Gaines stated that the Board's approval for Bruno Jr. to keep Kyla in the Unit was "**conditioned upon your adherence to the applicable Rules and Regulations of the Condominium relative**

**to dogs, a copy of which is enclosed herein.**" Docket No. 6-6 at 1; Docket No. 8-6 at 1 (emphasis in original). Attorney Gaines also stated that:

> As a reminder, the Board is aware of a recent incident where the dog exhibited aggressive behavior towards a child at the Condominium. As such, and as noted in our letter to you dated April 26, 2016, any future behavior of the same or similar nature by the dog will result in the immediate demand that the dog be removed from the premises.
>
> Finally, please take note, even though the Board has approved your request to have the dog, given that it took you almost three months to provide the information to support your son's request, all of the fines incurred during this period remain your responsibility, and if unpaid, will be a lien on your Unit. The total amount of the fines are $790.00. In addition, you are responsible for any and all legal fees and costs incurred related to this matter given that you failed to provide the information when initially requested. Please note that the fines and legal fees if not paid within thirty (30) days of the date of this letter, this amount will be considered delinquent.

Docket No. 6-6 at 1; Docket No. 8-6 at 1.

The Plaintiffs allege that the incident alleged in the letter never occurred and Bruno Jr. never received any notice or warning about it. Complaint at ¶ 65. They further allege that such false accusation by Attorney Gaines was clearly intended to create conditions for the Board to summarily have Kyla removed in the future. Id.

The completed Certification Form was submitted on May 4, 2016. Id. at ¶ 67. However, the daily fines continued for an additional sixteen days, including three days after Attorney Gaines notified Bruno Sr. that the accommodation was granted. Id.

On June 1, 2016 and September 8, 2016, Attorney Gaines sent letters to Bruno Sr. seeking to collect penalties, daily fines, and attorney's fees in the amount of $2,500. Id. at ¶ 68. Attorney Gaines has used the threat of a condominium super lien to "extort" these funds from the lender who holds a first mortgage on the Unit. Id. at ¶ 69.

11

II. ANALYSIS

A. Standard Of Review

A complaint must contain only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

In assessing the sufficiency of the complaint, "an inquiring court must first separate the wheat from chaff; that is, the court must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Guadalupe-Baez v. Pesquera, 819 F.3d 509, 514 (1st Cir. Apr. 20, 2016) (citing Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012)). The Court must then determine "whether the well-pleaded facts, taken in their entirety, permit 'the reasonable inference that the defendant is liable for the misconduct alleged.'" Id. (citations omitted).

B. The Complaint States A Plausible Claim For Violations Of The FHA

In Count I of the complaint, the Plaintiffs allege that the Defendants discriminated against them on the basis of a disability in violation of the FHA when they refused to allow them to keep Kyla in the Unit. Complaint ¶¶ 70-80. In Count II, the Plaintiffs allege that the Defendants violated Section 3617 of the FHA, which prohibits coercion, intimidation, threats and

interference as retaliation for exercising their rights under the FHA.[6] Defendants have moved to dismiss Counts I and II of the complaint. Docket No. 6 at 7-11. They argue that the Plaintiffs have failed to state facts that, if proven, would show that the Board refused to make a reasonable accommodation. Id. The Court disagrees.

The FHA prohibits discriminatory housing practices based on a person's "handicap."[7] Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. and Urban Dev., 620 F.3d 62, 66 (1st Cir. 2010) (citing 42 U.S.C. § 3604(f)). It outlaws discrimination "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap." Id. (quoting 42 U.S.C. § 3604(f)(2)). Discrimination includes a "refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [handicapped persons] equal opportunity to use and enjoy a dwelling." Id. (quoting 42 U.S.C. § 3604(f)(3)(B)).

In order to establish a prima facie case of discrimination for failure to accommodate, a plaintiff must show that (1) he is disabled within the meaning of the FHA (2) the defendants knew or should reasonably have known of his disability; (3) he requested a particular accommodation that is both reasonable and necessary to allow him an equal opportunity to use

---

[6] The complaint cites to 42 U.S.C. § 6917, which relates to the establishment of the Office of Ombudsman. It appears that the Plaintiffs intended to bring a claim under 42 U.S.C. § 3617.

[7] Though the FHA uses the term "handicap" rather than disability, 42 U.S.C. § 3604(f), the Plaintiffs in this case use the term disability, which is also the preferred term by scholars of disability studies. See Chavez v. Aber, 122 F. Supp. 3d 581, 594 n. 5 (W.D. Tex. 2015) (citing Bhogaita v. Altamonte Heights Condo Ass'n, Inc., 765 F.3d 1277, 1285 n. 2 (11th Cir. 2014)). The Court, therefore, treats these terms interchangeably and, unless quoting the statute or caselaw, uses the term "disability."

and enjoy the housing in question; and (4) the defendants refused to make the requested accommodation. Astralis Condo. Ass'n, 620 F.3d at 67.

A housing provider "has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation." Overlook Mut. Homes, Inc. v. Spencer, 415 Fed. Appx. 617, 621 (6th Cir. 2011) (quoting the Joint Statement by HUD and DOJ).[8] However, a housing provider is entitled to seek information from an allegedly disabled person to determine whether the person is actually disabled and the necessity of the requested accommodation. Id. According to the Joint Statement,

> In response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability . . ., (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation.

Joint Statement at 13. "This inquiry need not be highly intrusive." Overlook Mut. Homes, Inc., 415 Fed. Appx. At 621. "In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary." Id. at 621-622 (citing Joint Statement at 13-14).

The Defendants argue that any delay in approving Bruno Jr.'s request for a reasonable accommodation was caused by his own failure to provide the information requested by the Board to determine whether Bruno Jr. was in fact disabled and that he needed the particular accommodation requested. See Docket No. 6 at 8-9. Viewing the facts alleged in the complaint

---

[8] "Though the Joint Statement is a policy statement, rather than an authoritative interpretation of the FHA and therefore does 'not warrant *Chevron*-style deference,' it is nonetheless 'entitled to respect' to the extent that it has the 'power to persuade.'" Bhogaita, 765 F.3d at 1286, n. 3 (internal citations omitted).

14

in the light most favorable to the Plaintiffs, however, the Court is unable to find at this stage that any delay was caused by the Plaintiffs such that the complaint must be dismissed. Though perhaps the Plaintiffs could have acted more diligently in providing the information requested once the Board asked them to submit the Certification Form in February 2016, the Plaintiffs have alleged that the Board ignored their request for several months prior to that time. Specifically, the Plaintiffs allege that from around October 2015 through January 2016, Bruno Sr. attempted to engage the Board in order to request that Kyla be allowed in the Unit but the Board did not respond to his requests. See Complaint ¶¶ 36-40, 47. They also allege that the Board evaded his requests intentionally because they did not want any dogs in Candlelight Park and they knew that if they responded to the requests, Bruno Jr. would have been able to obtain the necessary documentation prior to moving into the Unit. Id. at ¶¶ 41-44, 46. In addition, they allege that the Board met to discuss Bruno Sr.'s request on one or more occasions between late November 2015 and early February 2016, without informing him of any such meeting(s). Id. at ¶ 45. These allegations are sufficient to state a plausible claim of undue delay in responding to the Plaintiffs' request for a reasonable accommodation.

      The Defendants also argue that because Bruno Jr. was never actually required to remove Kyla from the Unit and the Board has waived all fines and fees, Bruno Jr. was never actually deprived of a reasonable accommodation. Docket No. 6 at 10-11. In support of their argument, the Defendants cite cases where the court held that an indeterminate delay is not a constructive denial if the plaintiff is not actually deprived of his requested accommodation. Docket No. 6 at 10 (citing DuBois v. Ass'n of Apartment Owners of 2897 Kalakaua, 453 F.3d 1175 (9th Cir. 2006); Overlook Mutual Homes, Inc., 415 Fed. Appx. at 617-619). Overlook and DuBois involved service animals which were explicitly allowed to remain with their owners during the

15

investigation into their requests for accommodation under the FHA.[9]  Here, by contrast, the Board never granted a temporary exemption or waiver but rather demanded on several occasions that Kyla be removed within a certain period of time.  See Complaint ¶¶ 52 (page 11), 53, 57; Docket Nos. 6-1 to 6-5; 8-1 to 8-5.  In addition, the Plaintiffs allege that "under extreme duress," Bruno Jr. was forced to move out of the Unit for a short period of time.  Complaint ¶ 51.  Finally, while the Defendants allege that they have waived all fines and fees, the Plaintiffs deny that and instead allege that Bruno Sr. was fined for the period of time Kyla remained in the Unit before the request for accommodation was granted.  Id. at ¶¶ 52 (page 11), 64, 67-68, Docket No. 11 at 2.  As discussed above, the document that the Defendants have submitted in support of their allegation does not clearly establish that the Defendants in fact waived all fines and fees.  In light of the Plaintiffs' allegations to the contrary, the Court must assume, for purposes of this motion, that the Defendants have not waived any fines and fees.  Accordingly, the Court finds that the Plaintiffs have stated a plausible claim for violations of the FHA.[10]

---

[9] In addition, the Court notes that Overlook involved a decision on defendants' motion for judgment as a matter of law after trial while Dubois involved a decision on defendants' motion for summary judgment.  Overlook, 415 Fed. Appx. at 618; Dubois, 453 F.3d at 1177.

[10] The Court also notes that while the Defendants have moved to dismiss both Counts I and II of the complaint, they have not separately addressed the elements of a claim of interference under Section 3617.  See South Middlesex Opportunity Council, Inc. v. Town of Framingham, 752 F. Supp. 2d 85, 95 (D. Mass. 2010) (In order to establish a claim of interference under Section 3617, the plaintiff must show that (1) he is a member of an FHA-protected class; (2) he exercised a right protected by §§ 3603-3606 of the FHA, or aided others in exercising such rights; (3) the defendants' conduct was at least partially motivated by intentional discrimination; and (4) the defendants' conduct constituted coercion, intimidation, threat, or interference on account of having exercised, aided, or encouraged others in exercising a right protected by the FHA.).

C.     Bruno Sr. Has Standing Under The FHA

The Defendants argue that even if the complaint is not dismissed, all claims brought by Bruno Sr. should be dismissed because he has no standing to bring a claim under the FHA because he is not disabled. Docket No. 6 at 12. The Court disagrees.

The FHA provides a right of action for an "aggrieved person." 42 U.S.C. § 3613(a)(1)(A). An "aggrieved person" is defined as a person who "(1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602(i). The FHA definition of aggrieved person extends "as broadly as is permitted by Article III of the Constitution." Olsen v. Stark Homes, Inc., 759 F.3d 140, 158 (2nd Cir. 2014) (quoting Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209 (1972) (not-for-profit corporation as aggrieved person)).

In addition, the FHA makes it unlawful to discriminate against any person because of the disability of:

(A) that person,

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that person.

42 U.S.C. § 3604(f)(2).

Here, the Plaintiffs allege that the Defendants discriminated against both of them because of the disability of Bruno Jr., who is a "person residing in or intending to reside" in the Unit after it was sold to Bruno Sr. Bruno Jr. is also a person "associated with" Bruno Sr. See, e.g., Dubois, 453 F.3d at 1179 (stating that in order to prevail on a reasonable accommodation claim, plaintiff must show, among other things, that "the plaintiff or his associate" is disabled within the

meaning of the FHA). Further, the Plaintiffs allege that fines were levied against Bruno Sr. as the owner of the Unit, making him a person aggrieved by the Defendants' actions. "Since Plaintiff is the owner of the condominium and therefore subject to fines from the HOA . . ., under the FHA's broad definition of an aggrieved person, the plain language of the statute appears to give [him] standing under the FHA to bring suit." Espinoza v. Gentry Courts Home Owners Ass'n, Antioch, Inc., No. 17-cv-00488-SK, 2017 WL 2311310, at *3 (N.D. Cal. May 26, 2017). Accordingly, the Court finds that Bruno Sr. has standing to bring this action.

    D.  Whether The Plaintiffs Exhausted Administrative Remedies Is An Affirmative Defense Not Appropriate For A Motion To Dismiss

The Defendants argue that the Plaintiffs' claims under Chapter 151B should be dismissed because the Plaintiffs have not pled exhaustion of administrative remedies as required by Massachusetts law. Docket No. 6 at 13. However, failure to exhaust administrative remedies is an affirmative defense that Defendants bear the burden of pleading and proving. Carney v. Towne of Weare, No. 15-cv-291-LM, 2017 WL 680384, at *6 (D.N.H. Feb. 21, 2017); Fisher v. Town of Orange, 885 F. Supp. 2d 468, 478 (D. Mass. 2012). As such, the Defendants cannot prevail on a motion to dismiss on these grounds unless the "facts establishing the defense [are] clear 'on the face of the plaintiff's pleadings.'" Santana-Castro v. Toledo-Davila, 579 F.3d 109, 113-114 (1st Cir. 2009) (citation omitted). Here, it is not clear from the face of the complaint that the Plaintiffs have failed to exhaust administrative remedies. Accordingly, the Court declines to dismiss the Chapter 151B claim on that basis.

E. The Plaintiffs' Claims Against Attorney Gaines And
The Law Firm Are Barred By The Litigation Privilege

Here, the Plaintiffs bring their claims not only against the Board members but also against the attorney and the Law Firm representing the Board. The Defendants are correct that those claims are barred by the litigation privilege.

"Under Massachusetts law, an attorney's statements are absolutely privileged 'where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation.'" Blanchette v. Cataldo, 734 F.2d 869, 877 (1st Cir. 1984) (quoting Sriberg v. Raymond, 370 Mass. 105, 109 (1976)). This doctrine was motivated by "the public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." Meltzer v. Grant, 193 F. Supp. 2d 373, 377 (D. Mass. 2002) (quotation omitted). The privilege applies as a general bar to all civil liability based upon an attorney's statements, and it applies even if the offensive statements were uttered maliciously or in bad faith. Doe v. Nutter, McClennen & Fish, 41 Mass. App. Ct. 137, 140 (1996). The litigation privilege applies to communications made preliminary to proposed judicial proceedings if judicial proceedings are contemplated in good faith and under serious consideration. Meltzer, 193 F. Supp. 2d at 381.

Plaintiffs' claims against Attorney Gaines and the Law Firm are based on their correspondence with the Plaintiffs in connection with the Board's enforcement of the Candlelight Park's rules and regulations and the Plaintiffs' request for a reasonable accommodation. From the allegations in the Complaint and the correspondence, it is clear that Attorney Gaines and the Law Firm were acting solely in their capacity as the lawyers for the Board in connection with potential litigation regarding the Plaintiffs' claims and the Board's potential legal action to

19

remove Kyla from the Unit. Other than using conclusory legal terms such as "conspiracy," <u>see</u>, <u>e.g.</u>, Complaint ¶ 51, the Plaintiffs do not allege any facts to show that Attorney Gaines and the Law Firm were acting other than in their function as attorneys for the Board. Accordingly, the Court dismisses the Plaintiffs' claims against Attorney Gaines and the Law Firm.

III. <u>ORDER</u>

For the foregoing reasons, the Court denies the Board and Trust's motion to dismiss (Docket No. 5) and grants Attorney Gaines and the Law Firm's motion to dismiss (Docket No. 7).

    /s/ Jennifer C. Boal
JENNIFER C. BOAL
UNITED STATES MAGISTRATE JUDGE